**Affirmed and Majority and Dissenting Opinions filed August 26, 2014.**



In the

# Fourteenth Court of Appeals

---

### NO. 14-13-00820-CV

---

## THE BRANCH LAW FIRM, L.L.P AND TURNER W. BRANCH, Appellants

### V.

## WILLIAM SHANE OSBORN, Appellee

---

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2012-34395**

---

## MAJORITY OPINION

In this interlocutory appeal, we decide whether the trial court abused its discretion in denying a motion in which two defendants sought to compel the plaintiff to arbitrate his claims in reliance upon an arbitration clause in a heavily redacted copy of a settlement agreement that the plaintiff did not sign. The

plaintiff and the trial court have never seen the entirety of this settlement agreement, and the plaintiff objected to the defendants' failure to provide a copy of the entire agreement. We conclude that the movants did not prove they were entitled to an order compelling arbitration under these circumstances. Accordingly, we affirm the trial court's order denying the motion, without prejudice to the movants' ability to be heard on the merits of a subsequent motion to compel.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In August 2010, appellee William Shane Osborn began working as an associate for the Branch Law Firm, L.L.P., a Texas limited liability partnership located in Houston, Texas (hereinafter, the "Texas Law Firm"). Osborn's initial salary was $50,000 per year. In October 2011, Osborn received a raise in salary to $100,000 a year. According to Osborn, his bonus structure consisted of 10% of attorney's fees in any case he worked on, plus another 15% if he originated the case, as well as at least 5% of the total fees collected from the Plaintiff Steering Committee allocation for the hours billed in the Avandia[1] multidistrict litigation.[2] Osborn was terminated on May 7, 2012. While employed by the Texas Law Firm, in addition to the Avandia multidistrict litigation, Osborn worked on a mass tort case involving hip implants and an individual lawsuit.

In June 2012, Osborn filed suit against the Texas Law Firm and Turner Branch (hereinafter, collectively, the "Branch Parties"). According to Turner Branch's affidavit, he is a partner in the Texas Law Firm and a principal, officer,

---

[1] Avandia is a diabetes drug manufactured by GlaxoSmithKline.

[2] The Branch Law Firm, L.L.P. and Turner Branch's position is that all of Osborn's bonuses were discretionary.

and major stockholder in the Branch Law Firm in New Mexico (hereinafter, the "New Mexico Law Firm"). Osborn alleged breach of contract based upon the Branch Parties' refusing to pay him the bonus of 10% of attorney's fees in cases he worked on, as well as the Branch Parties' alleged failure to pay him for working May 1 through May 7, 2012, and failure to pay him 5% of the total fees collected from the Plaintiff Steering Committee allocation for hours billed in the Avandia multidistrict litigation. Osborn also asserted a fraud claim based on the Branch Parties' alleged material misrepresentation of the 10% bonus of attorney's fees. The Branch Parties filed various counterclaims against Osborn, including for breach of fiduciary duty, fraud, unjust enrichment, conversion, and theft, alleging his fraudulent use of a firm credit card for personal charges.

In September 2012, Osborn filed a motion to compel the Branch Parties to file answers to his interrogatories, specifically with regard to the amount of attorney's fees received in cases Osborn worked on, including the Avandia cases. The parties took opposite positions as to whether the amount of attorney's fees to be paid under a Master Settlement Agreement (hereinafter, the "MSA") should remain confidential. In December 2010, the MSA was signed by attorneys on behalf of GlaxoSmithKline LLC and signed by Turner Branch on behalf of the New Mexico Law Firm, as well as "The Participating Claimants [a]nd The Participating Law Firms."

Apparently, during the proceedings on the motion to compel, the Branch Parties provided and the trial court read to the parties certain confidentiality language purportedly contained in the MSA. The parties then provided briefing on the interpretation of the confidentiality language, and the trial court held a hearing on April 19, 2013. On April 24, 2013, the trial court granted the motion to compel

and ordered the Branch Parties to provide Osborn with the settlement amount, as well as the amount of attorney's fees as contained in the MSA.

On June 26, 2013, Osborn amended his suit to add Turner W. Branch, P.A., a New Mexico professional association located in Albuquerque, New Mexico, as a defendant. The record does not reflect that Turner W. Branch, P.A. has yet appeared. In their brief, the Branch Parties indicate that this New Mexico entity also does business as the Branch Law Firm, so it is possible this newly added defendant is the New Mexico Law Firm.[3]

In his amended petition, Osborn also added claims for quantum meruit, promissory estoppel, fraudulent inducement, abuse of process, and malicious prosecution. By this time, Osborn and the Branch Parties had filed various motions for summary judgment.[4]

On June 28, 2013, the Branch Parties filed a motion to compel arbitration and stay proceedings based upon the MSA. They attached a "redacted copy of portions of the MSA relevant to this motion." This excerpt included the definition of "Participating Law Firms":

> "Participating Law Firms" refers to The Branch Law Firm, as Lead Participating Law Firm, and all other law firms, including all attorney members of or affiliated with each firm, that represent or

---

[3] As reflected in the record, this new defendant has not filed a motion to compel arbitration, nor has the trial court determined whether Osborn should be compelled to arbitrate his claims against this defendant. Thus, the issue of whether Osborn should be compelled to arbitrate these claims is not before us.

[4] In April and May 2013, the trial court signed orders denying Osborn's summary judgment motions as to his claims for breach of contract and fraud. The record does not reflect any ruling on the Branch Parties' partial motion for summary judgment as to Osborn's contract and fraud claims. Nor does the record reflect a ruling on Osborn's partial motion for summary judgment as to the Branch Parties' counterclaims for conversion and theft.

otherwise have any financial interest in the Participating Claimants whose cases and/or claims are the subject of this Agreement. A list of Participating Law Firms apart from The Branch Law Firm is being provided to GSK and is attached hereto as Exhibit "A."[5]

Each Participating Law Firm, including all its current and future attorney members of or affiliated with each Firm, acknowledges that it shall be bound to the terms and conditions of this Agreement and any Addendum or exhibits hereto.

The excerpt included a section entitled "Challenges to or Disputes Involving the Agreement":

Any challenges to or disputes arising out of or relating to an alleged violation of this Agreement, including but not limited to disputes between GSK and Participating Law Firms and/or Participating Claimants and disputes between or among Participating Law Firms and/or members of Participating Law Firms arising out of or in connection with this Agreement, shall be referred for binding determination to Judicial Arbitration Mediation Services ("JAMS") for resolution, with all costs to be shared equally. The parties shall work together to agree on a binding neutral arbitrator to resolve any and all disputes, and if an agreed upon arbitrator cannot be selected, JAMS' complex resolution procedures shall control the selection of a neutral arbitrator.

The excerpt also included the MSA's cover and signature pages.

The Branch Law Firm, L.L.P. and Turner Branch argued that the MSA is a valid agreement to arbitrate and that Osborn's claims fall within the scope of the broad arbitration clause. While they acknowledged Osborn did not sign the MSA, they argued that he otherwise is bound to its terms under contract or agency law, or the doctrine of direct benefits estoppel.

---

[5] The Branch Parties did not provide, and the record does not contain, a copy of Exhibit "A" to the MSA.

Within his response, Osborn argued that an arbitration agreement is only valid if it satisfies general Texas contract law, which requires courts to construe agreements as a whole in order to harmonize and give effect to all provisions. Osborn objected to the Branch Parties' only including seven redacted pages of the MSA, which appears to contain at least thirty-four pages.[6] Osborn also objected to the Branch Parties' expecting Osborn and the trial court to take their word that the excerpts contained all definitions, clauses, and appendices pertinent to the arbitration issues. Osborn noted he could not verify that the Branch Parties had provided a copy of the entire arbitration clause. Osborn asserted that he is entitled to see the entire MSA.[7]

The Branch Parties apparently then provided Osborn with another, less-redacted copy of the MSA. On July 17, 2013, Osborn filed a motion to compel compliance with the court's April 2013 order because the defendants still had not provided the amount of settlement and amount of attorney's fees contained in the MSA, and had specifically redacted the settlement amount in the copy of the MSA they had provided.[8] On July 18, 2013, under seal, Osborn filed a supplemental response to the Branch Parties' motion to compel arbitration and attached as a sealed exhibit one additional page of the MSA provided by the defendants. On July 22, 2013, the Branch Parties filed a reply in support of their motion to compel

---

[6] The signature page reflects a page number of "34."

[7] According to Osborn, his claims arose not from any MSA, but rather from an October 14, 2011 memorandum signed by Turner Branch stating that, "per [their] agreement," Osborn would receive the 10% attorney's fees bonus for cases he worked on and the at least 5% bonus of the total fees collected from the Avandia Plaintiff Steering Committee allocation. In addition, Osborn challenged the Branch Parties' position on the scope of any arbitration agreement and on application of direct benefits estoppel, and further argued that the Branch Parties had waived their right to seek arbitration.

[8] Osborn filed this one-page redacted exhibit under seal with the trial court.

arbitration, and a response to Osborn's motion to compel compliance with the discovery order. That same day, the trial court held a hearing on the parties' respective motions.

On September 17, 2013, the trial court signed an order that the Branch Parties had to provide Osborn with the amount of settlement and amount of attorney's fees as contained in the MSA by the end of business that day. The trial court also signed an order denying the Branch Parties' motion to compel arbitration and stay proceedings. No findings of fact and conclusions of law were filed, and the trial court's order does not contain a statement of the reasons for the denial.

The Branch Parties timely appealed the denial of their motion to compel arbitration. On appeal, in a single issue, the Branch Parties argue that because Osborn is bound by a valid agreement to arbitrate and his claims fall within the scope of that agreement, and because they have not waived their right to arbitration, the trial court erred in denying their motion to compel arbitration.

## II. ANALYSIS

### A. Applicable law

There are strong policies and presumptions favoring arbitration. *See Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995). However, arbitration cannot be ordered in the absence of an agreement to arbitrate. *See Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994) (per curiam). A party seeking to compel a nonsignatory to arbitrate his claims must establish: (1) a valid arbitration agreement exists that binds the nonsignatory and (2) the claims at issue fall within

the scope of the agreement.[9]  *See In re Rubiola*, 334 S.W.3d 220, 223 (Tex. 2011); *Osornia v. Amerimex Motors & Controls*, 367 S.W.3d 707, 711 (Tex. App.— Houston [14th Dist.] 2012, no pet.).  The presumptions favoring arbitration do not apply to a court's determination as to whether the first showing has been made. *See In re Kellogg, Brown & Root, Inc.*, 166 S.W.3d 732, 737–38 (Tex. 2005) (orig. proceeding).  Instead, because arbitration is a creature of contract, a court must first decide whether an agreement was reached, applying state-law principles of contract.  *In re Poly-Am., L.P.*, 262 S.W.3d 337, 348 (Tex. 2008); *Am. Med. Techs., Inc. v. Miller*, 149 S.W.3d 265, 273 (Tex. App.—Houston [14th Dist.] 2004, no pet., combined appeal & orig. proceeding).[10]

Inasmuch as the Branch Parties sought to compel arbitration, they bore the initial burden to prove that a valid arbitration agreement which binds Osborn exists.  *See Rubiola*, 334 S.W.3d at 223–24; *Osornia*, 367 S.W.3d at 711.  If they satisfy that burden, then any doubts as to whether Osborn's claims against the Branch Parties fall within the scope of the arbitration clause must be resolved in

[9] If these two showings are made, the burden shifts to the party opposing arbitration to present a valid defense to the agreement, and absent evidence supporting such a defense, the trial court must compel arbitration.  *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003); *Osornia v. Amerimex Motors & Controls*, 367 S.W.3d 707, 711 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

[10] The parts of the MSA reflected in the record are silent as to whether the arbitration clause is governed by the Federal Arbitration Act ("Federal Act") or the Texas General Arbitration Act ("Texas Act").  Neither Osborn nor the Branch Parties assert that the Federal Act applies or that it preempts any aspect of the Texas Act relevant to this case.  In this situation, we need not address whether the Federal Act applies, and we treat this case as one under the Texas Act.  *See Bates v. MTH Homes-Texas, L.P.*, 177 S.W.3d 419, 421 (Tex. App.—Houston [1st Dist.] 2005, no pet.).  Even so, because the substantive principles applicable to the analysis in this appeal are the same under both the Federal Act and the Texas Act, we cite in this opinion cases under the Federal Act and the Texas Act without stating under which statute the cases were decided.  *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 n.10 (Tex. 2008).

favor of arbitration. *See Marshall*, 909 S.W.2d at 899. A court should not deny arbitration unless the court can say with positive assurance that an arbitration clause is not susceptible of an interpretation that would cover the claims at issue. *Id.* In determining whether a claim falls within the scope of an arbitration agreement, we focus on Osborn's factual allegations, rather than the legal claims asserted by Osborn. *See id.* at 900. The presumption of arbitrability is particularly applicable when the arbitration clause is broad. *See Babcock & Wilcox Co. v. PMAC, Ltd.*, 863 S.W.2d 225, 230 (Tex. App.—Houston [14th Dist.] 1993, writ denied). In such an instance, absent any express provision excluding a particular grievance from arbitration, only the most forceful evidence of purpose to exclude the claim from arbitration can prevail, and Osborn would have the burden of showing that his claims against the Branch Parties fall outside the scope of the arbitration clause. *See Marshall*, 909 S.W.2d at 900; *Babcock & Wilcox Co.*, 863 S.W.2d at 230. However, the strong policy in favor of arbitration cannot serve to stretch an arbitration clause beyond the scope intended by the parties or to allow modification of the unambiguous meaning of the arbitration clause. *See Osornia*, 367 S.W.3d at 712.

While an arbitration clause standing alone might appear to encompass the claims in question, the court cannot confine its analysis to the construction of that clause alone. The court must examine the entire agreement. Although the parties broadly may agree to arbitrate in one part of the agreement, they also may place limits on the agreement to arbitrate in another part of the agreement. *Katz v. Feinberg*, 167 F. Supp. 2d 556, 566 (S.D.N.Y. 2001); *see J.M. Davidson*, 128 S.W.3d at 229 (stating that, in construing an agreement to arbitrate contained in a written contract, courts must examine the entire writing in an effort to harmonize and give effect to all the provisions of the contract). In determining whether a

given dispute must be arbitrated, a court looks to all terms of the parties' agreement bearing on arbitration. *See J.M. Davidson*, 128 S.W.3d at 229. Even though the wording of an arbitration clause may be broad, its scope may be limited by language elsewhere in the agreement in which the parties unambiguously negate or limit the arbitration clause with respect to a given matter in dispute. *Woodcrest Nursing Home v. Local 144, Hotel, Hosp., Nursing Home and Allied Servs. Union,* 788 F.2d 894, 898 (2d Cir. 1986); *Katz*, 167 F. Supp. 2d at 566; *see J.M. Davidson*, 128 S.W.3d at 229.

## B. Standard of review

Denial of a motion to compel arbitration generally triggers the abuse-of-discretion standard. *See Okorafor v. Uncle Sam & Assocs., Inc.*, 295 S.W.3d 27, 38 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *In re D. Wilson Constr. Co.*, 196 S.W.3d 774, 780 (Tex. 2006) (orig. proceeding)). "An order denying arbitration must be upheld if it is proper on any basis considered by the trial court." *In re Weeks Marine, Inc.*, 242 S.W.3d 849, 854 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding).

A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Under this standard, we defer to a trial court's factual determinations if they are supported by evidence, but review a trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding); *see D. Wilson Constr.*, 196 S.W.3d at 781.

**C. The trial court did not abuse its discretion in refusing to compel arbitration when it did not have the entire MSA.**

Arbitration agreements are interpreted under traditional contract principles. *J.M. Davidson*, 128 S.W.3d at 227. When construing an agreement to arbitrate contained in a written contract, the courts' primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *Id.* at 229; *see Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). In order to achieve this objective, courts must examine and consider the entire writing as a whole in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *J.M. Davidson*, 128 S.W.3d at 229; *Coker*, 650 S.W.2d at 393. We cannot give any single provision taken alone controlling effect; rather, we must consider all the provisions with reference to the whole instrument. *J.M. Davidson*, 128 S.W.3d at 229; *Coker*, 650 S.W.2d at 393; *see Woodcrest Nursing Home*, 788 F.2d at 898; *Katz*, 167 F. Supp. 2d at 566.

In the summary judgment context, this court in *Patterson v. City of Brenham* determined that it could not properly interpret an agreement because the record did not contain a copy of the entire agreement. No. 14-10-00111-CV, 2011 WL 782231, at *3 (Tex. App.—Houston [14th Dist.] Mar. 8, 2011, no pet.) (mem. op.) (citing *Coker*, 650 S.W.3d at 393). There, both of the city's grounds for summary judgment were based upon an alleged release agreement. *Id.* at *2. On appeal, Patterson contended that the city had failed to present conclusive evidence regarding the contents of the release agreement. *Id.* Not only did the record not demonstrate that the release agreement at issue was submitted to the trial court prior to its signing the summary judgment, but also the language from the alleged agreement quoted by the city in its motion, assuming it even could be reviewed as summary judgment evidence, included only portions of the release agreement. *Id.*

at \*2–3. We concluded that the trial court erred in granting the city summary judgment, noting that "[i]n the absence of the entirety of the release agreement in evidence, it is impossible to know exactly what Patterson released or waived in signing the agreement." *Id.* at \*3.

Here, Osborn expressly objected to the Branch Parties' not providing the trial court with the entirety of the MSA. Osborn cited the principle that courts must interpret agreements as a whole and argued it was improper for the Branch Parties to move for arbitration based upon an incomplete document. Despite the Branch Parties' contention otherwise, Osborn also argued in his response below (and on appeal) that the Branch Parties failed to establish their entitlement to an order compelling arbitration.

Turner Branch signed the MSA on behalf of the Participating Law Firms, as defined in the MSA. The Branch Parties assert that nonsignatory Osborn falls within the definition of Participating Law Firms and therefore Turner Branch signed the MSA as Osborn's agent. In addition, the Branch Parties contend if Osborn and the Texas Law Firm fall within the definition of Participating Law Firms, then disputes between them are disputes between or among Participating Law Firms that arguably fall within the scope of the MSA's arbitration clause. But, to fall within the definition of Participating Law Firms, Osborn must have been an "attorney member[] of or affiliated with" a firm representing or having a financial interest in the Participating Claimants whose cases or claims are the subject of the MSA. The Branch Parties argue that this phrase refers to attorneys who are members of such a firm or attorneys who are affiliated with such a firm. However, this phrase also could be construed to refer to attorney members of such firms or attorney members affiliated with such firms. To properly construe this

12

term, a court would need to examine the entire MSA, to determine if any other definitions or provisions inform the construction of this phrase. The Branch Parties have not provided a complete copy of the MSA to Osborn or tendered one to the trial court in camera or otherwise. Under these circumstances, we cannot determine the meaning of this phrase applying the applicable standard of review.[11]

The Branch Parties emphasize the strong presumption that claims fall within the scope of a valid arbitration provision. However, in determining the scope of the MSA's arbitration agreement, this strong presumption cannot be used to stretch the language of the MSA pertaining to arbitration beyond the scope intended by the parties or to allow modification of the unambiguous meaning of this arbitration language. *See Osornia*, 367 S.W.3d at 712. Therefore, even as to the scope inquiry, the court still must examine all the language of the MSA to determine which portions pertain to arbitration. *See J.M. Davidson*, 128 S.W.3d at 229; *Osornia*, 367 S.W.3d at 712.

The Branch Parties also rely upon a line of cases containing language to the effect that "'if the facts alleged 'touch matters,' have a 'significant relationship' to, are 'inextricably enmeshed' with, or are 'factually intertwined' with the contract that is subject to the arbitration agreement, the claim will be arbitrable.'" *AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190, 195 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (quoting *Pennzoil Co. v. Arnold*, 30 S.W.3d 494, 498 (Tex. App.—San Antonio 2000, no pet.)). Significantly, the cases in which this formulation has been utilized have involved very broad arbitration clauses in which the parties agree to arbitrate all claims arising out of or relating to a contract or in

---

[11] It would be premature for this court to address whether Osborn is in fact a "member," as our dissenting colleague concludes. *See* dissent at p.4.

which the parties agree to arbitrate all disputes that may arise among them. *See Osornia*, 367 S.W.3d at 713–14. To determine if this line of cases applies, we would need to determine if the MSA's arbitration agreement is as broad as the agreements in this line of cases. *See id.* Even presuming that the language in the portions of the MSA that we have indicates such a broad agreement, other portions of the MSA that we do not have might significantly narrow the scope of the MSA's arbitration agreement.[12] *See J.M. Davidson*, 128 S.W.3d at 229; *see also Woodcrest Nursing Home,* 788 F.2d at 898; *Katz*, 167 F. Supp. 2d at 566.

The record does not reflect that the Branch Parties ever submitted the complete MSA to the trial court.[13] In addition, this case does not involve a situation in which the opposing party, Osborn, has access to a copy of the entire contract and it might be argued that he would have submitted any other parts of the contract relating to the arbitration issues, if there were any.[14] The Branch Parties and their counsel represented to the trial court and to Osborn that they had submitted all parts of the MSA relevant to the issues raised by their motion to compel arbitration. However, neither Osborn, nor the trial court or this court is

---

[12] It also would be premature for this court to apply this line of cases, as does our dissenting colleague. *See dissent* at pp. 3-4.

[13] At the most, the trial court had before it six redacted pages, one apparently unredacted page, certain confidentiality language, and the cover and signature pages of the MSA.

[14] This case does not present the limited circumstances of *Wheeler v. White*, where this court reviewed whether a Houston Police Department sergeant seeking a promotion had standing to sue the city parties under a meet and confer agreement between the police union and the city despite the city parties' only attaching portions of the alleged agreement to their motion to dismiss. 314 S.W.3d 225, 230 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). There, the parties did not dispute that all relevant portions of the agreement were contained in the record. *See id.* In addition, the sergeant presumably had access to the entire agreement, and he had not complained either in the trial court or on appeal regarding the city parties' failure to provide a complete copy of the agreement. *See id.*

required to rely on mere assurances of the Branch Parties or their counsel.[15] *See Patterson*, 2011 WL 782231, at \*3. We see no reason to depart from the general rule that a writing must be examined as a whole in an effort to harmonize and give effect to all its provisions so that none is rendered meaningless. *See J.M. Davidson*, 128 S.W.3d at 229; *Coker*, 650 S.W.2d at 393; *Patterson*, 2011 WL 782231, at \*3. In the absence of the entirety of the MSA in evidence, neither the trial court nor this court properly is able to determine: (1) whether a valid arbitration agreement exists that binds Osborn and (2) whether Osborn's claims fall within the scope of the MSA's arbitration agreement.[16] *See Rubiola*, 334 S.W.3d at 223; *Osornia*, 367 S.W.3d at 711; *Patterson*, 2011 WL 782231, at \*3. On this record, we cannot say that the Branch Parties established they were entitled to an order compelling arbitration. *See Patterson*, 2011 WL 782231, at \*3.

Therefore, we conclude that the trial court did not abuse its discretion in denying the Branch Parties' motion to compel Osborn to arbitrate his claims.[17] *See*

---

[15] We need not address which procedures are available to balance Osborn's interests in opposing the Branch Parties' motion to compel arbitration with the interests involved in the MSA's confidentiality provisions. Nonetheless, procedures are available to protect confidentiality while vindicating Osborn's interests.

[16] To do otherwise surely would be an exercise in speculation and in stark contrast to situations where courts have properly considered the entirety of an arbitration agreement. *See In re Media Arts Grp., Inc.*, 116 S.W.3d 900, 907–08 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (construing "entire dealer agreement" to determine existence of arbitration agreement*); see also Serna v. Int'l Bank of Commerce*, 357 S.W.3d 89, 91–92 (Tex. App.—San Antonio 2011, no pet.) (construing earnest money contract on review of arbitration award); *Trudy's Tex. Star, Inc. v. Weingarten Realty Investors*, No. 03-03-00538-CV, 2004 WL 1792374, at \*3–4 (Tex. App.—Austin Aug. 12, 2004, pet. denied) (mem. op.) (construing lease on review of summary judgment where parties disagreed over whether appraisal process or arbitration applied to rent dispute).

[17] In their reply, the Branch Parties stated that Osborn incorrectly claimed that the Branch Law Firm's fee agreements with its Avandia clients governed these disputes rather than the MSA. The Branch Parties argue that, even if Osborn were correct in this regard, he still would have to arbitrate his claims based on arbitration clauses contained in these client agreements. The Branch Parties attached an exemplar agreement between "the Branch Legal Group, LLP" of

*In re Universal Fins. Consulting Grp., Inc.*, No. 14-08-00226-CV, 2008 WL 2133186, at *1–2 (Tex. App.—Houston [14th Dist.] May 20, 2008, orig. proceeding) (mem. op.) (trial court did not abuse discretion in denying arbitration where court could not consider unauthenticated documents to determine existence of valid arbitration agreement); *see also Grace Interest, LLC v. Wallis State Bank*, 431 S.W.3d 110, 123 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (no trial court error in refusing to compel arbitration where movant did not establish existence of valid arbitration agreement).

Because this threshold subissue is dispositive of the appeal, we do not reach the rest of the Branch Parties' arguments. Tex. R. App. P. 47.1; *see Weeks Marine*, 242 S.W.3d at 854. We overrule their sole issue on appeal.

### III.    CONCLUSION

Accordingly, we affirm the trial court's order denying the Branch Parties' motion to compel arbitration and stay proceedings.


/s/     Marc W. Brown
Justice

Panel consists of Chief Justice Frost, and Justices Donovan and Brown. (Donovan, J., Dissenting).

---

Albuquerque, New Mexico and an Avandia client. The Branch Parties did not seek to compel arbitration based on these agreements in their motion to compel. They made this argument in the alternative to the extent that the trial court concluded these fee agreements governed the disputes. The trial court did not have to reach this conclusion to deny the Branch Parties' motion, nor do we have to address this issue to affirm the trial court's order. Therefore, we need not and do not address the arbitration provisions in any Avandia client agreements.

16